**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **SMART PLASTICS LLC & SMART PLASTICS II LLC,** | |
| **Plaintiffs,** | **Case No. 23-cv-01220** |
| **v.** | **Judge Ronald A. Guzman** |
| **ROBERT S. ABRAMS,** | |
| **Defendant.** | |

**DEFENDANT ROBERT S. ABRAMS'**
**ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

Defendant Robert S. Abrams, upon personal knowledge or upon information and belief, answers Plaintiffs Smart Plastics LLC and Smart Plastics II LLC's (collectively, the "Plaintiffs") Complaint as follows. For reference only, Mr. Abrams has included in this Answer the captions and headings used in the Complaint, but Mr. Abrams does not hereby admit the truth of any allegations contained therein, or any inference that could be drawn therefrom. Any allegations in the Complaint not expressly admitted herein are denied.

**NATURE OF THE ACTION**

This is an action for breach by Defendant of his January 29, 2015 Secured Promissory Note (herein "Note") for $5,366,589 made payable to Plaintiffs. The maturity date of the Note was October 1, 2015. Paragraphs 1 and 2 of the Note require repayment of principal ($5,366,589.00) plus interest from the date of the Note at the Basic Interest rate of 7% per annum through the Maturity Date of October 1, 2015, and at the Default Interest rate of 12% per annum after the

October 1, 2015 Maturity Date, plus attorneys' fees and costs of collection. The principal and accrued interest due under the terms of the Note exceeds $10 million.

**ANSWER**: Mr. Abrams admits that Defendants purport to allege a claim for breach of the Note, and that Defendants seek the alleged principal amount of the Note plus alleged interest and attorney's fees and cost of collection.  Mr. Abrams denies that Plaintiffs' claims have any merit or that Plaintiffs are entitled to any judgment against or relief from Mr. Abrams.  Mr. Abrams denies the remaining allegations of this Paragraph, except he neither admits nor denies the allegations to the extent they consist of legal conclusions.

## THE PARTIES

1.      Plaintiff Smart Plastics, L.L.C is a Delaware limited liability company with its primary place of business in Chicago, Illinois.

**ANSWER**: Admit.

2.      Plaintiff Smart Plastics II, LLC is a Delaware limited liability company with its primary place of business in Chicago, Illinois.

**ANSWER**: Admit.

3.      Defendant Robert S. Abrams is a sophisticated businessman who resides in and is a citizen of New York, NY.

**ANSWER**: Mr. Abrams admits that he resides in and is a citizen of New York, NY, objects to Plaintiffs' use of the ambiguous term "sophisticated businessman," and otherwise denies the remaining allegations in Paragraph 3.

## JURISDICTION AND VENUE

4.      This Court has personal jurisdiction over Defendant pursuant to 735 ILCS 5/2-209(a)(7) and (c), and venue is proper in this Court, because by signing the Note Defendant agreed

that, "[a]ll actions brought to interpret or enforce this Agreement shall be brought in the exclusive forum of the courts located in Chicago, Illinois and all parties agree not to assert any defenses based on lack of personal jurisdiction, forum non conveniens or inappropriate venue." In addition, the Note requires performance (payment) in Chicago, Illinois and this action arises out of Defendant's failure to pay the Note as promised in Chicago, Illinois.

**ANSWER**: Mr. Abrams respectfully refers the Court to 735 ILCS 5/2-209(a)(7) and (c) for the true and complete contents of those provisions, and denies any allegations inconsistent therewith. Mr. Abrams admits that Plaintiffs have accurately quoted the Note in Paragraph 4, and otherwise denies any remaining allegations of this Paragraph, except he neither admits nor denies the allegations to the extent they consist of legal conclusions.

## FACTUAL ALLEGATIONS

5.      On or about January 29, 2015, Defendant signed the Note, which was in the principal amount of five million three hundred sixty-six thousand five hundred eighty-nine and no/100 dollars ($5,366,589.00). The Note was made payable to Plaintiffs in exchange for a loan in its principal amount which the Defendant received from Plaintiffs. A true and correct copy of the Note is attached as Exhibit "A."

**ANSWER**: Mr. Abrams admits the authenticity of his signature appearing at Exhibit A of the Complaint, and specifically denies that the Note was made payable to Plaintiffs in exchange for a loan which Mr. Abrams received from Plaintiffs, and otherwise denies any remaining allegations of this Paragraph, except he neither admits nor denies the allegations to the extent they consist of legal conclusions.

3

6.      The maturity date of Exhibit "A" was no later than October 1, 2015 unless certain exceptions applied. None of the stated exceptions applied and the Note that is Exhibit "A" matured on October 1, 2015.

**ANSWER**: Mr. Abrams denies the allegations of this Paragraph, except he neither admits nor denies the allegations to the extent they consist of legal conclusions.

7.      Plaintiffs have fully performed all their obligations owed to Defendant under Exhibit "A," which upon default entitles Plaintiffs to interest as well as Plaintiffs' reasonable attorney's fees and collection costs.

**ANSWER**: Mr. Abrams denies the allegations of this Paragraph, except he neither admits nor denies the allegations to the extent they consist of legal conclusions.

8.      Defendant's obligation to pay all sums due and payable pursuant to Exhibit A is absolute and unconditional.

**ANSWER**: Mr. Abrams denies the allegations of this Paragraph, except he neither admits nor denies the allegations to the extent they consist of legal conclusions.

9.      The sums now due under Exhibit "A" include the principal amount of $5,366,589.00, interest that has accrued on the said principal amount from January 29, 2015 through October I, 2015 at the Basic Interest rate of 7% per annum, plus interest that has accrued on the said principal amount after October I, 2015 at the Default Interest rate of 12%, plus Plaintiffs' attorneys' fees and Plaintiffs' costs of collection all as set forth in Exhibit "A."

**ANSWER**: Mr. Abrams denies the allegations of this Paragraph, except he neither admits nor denies the allegations to the extent they consist of legal conclusions.

10.     Plaintiffs demanded payment of the sums due under Exhibit "A," but Defendant has refused and continues to refuse to pay.

**ANSWER**: Mr. Abrams admits that Plaintiffs have demanded payment (wrongfully) under the purported Note, but specifically denies that any sums are due or owing to Plaintiffs under the Note appearing at Exhibit A of the Complaint, and otherwise denies the allegations of this Paragraph, except he neither admits nor denies the allegations to the extent they consist of legal conclusions.

11.     As a result of Defendant's breach of his promises to Plaintiffs to repay the sums due and payable to Plaintiffs pursuant to Exhibit "A," the Plaintiffs have suffered and will continue to suffer ongoing damages.

**ANSWER**: Mr. Abrams denies the allegations of this Paragraph, except he neither admits nor denies the allegations to the extent they consist of legal conclusions.

12.     As of December 9, 2022, $10,808,161.20 in principal and interest alone is due and payable by Defendant to Plaintiffs under Exhibit "A," and interest continues to accrue on the unpaid principal at $1,788,86 ($5,366,589 x .12/360 = $1,788.86) per each day that elapses.

**ANSWER**: Mr. Abrams denies the allegations of this Paragraph, except he neither admits nor denies the allegations to the extent they consist of legal conclusions.

## AFFIRMATIVE DEFENSES

Mr. Abrams asserts the following affirmative defenses, without assuming the burden of proof on such defenses that would otherwise rest on Plaintiffs. Mr. Abrams reserves the right to amend or supplement these affirmative defenses as discovery proceeds.

In support of his affirmative defenses, Mr. Abrams states as follows:

## STATEMENT OF FACTS SUPPORTING
## AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

1. Plaintiffs are entities that held a minority investment in Defendant's company, CV Holdings, LLC ("CV Holdings"), before their obstructive and extortive tactics forced a much lower sale for that business than what Defendant would have, and could have, realized.

2. Those tactics also generated the invalid Note central to Plaintiffs' purported claims in this action.

3. Indeed, the timing of Plaintiffs' suit itself points to their bad faith in connection with the Note. Plaintiffs had been controlled by well-known investor, Richard Driehaus. For nearly eight years, Plaintiffs did nothing to pursue the purported Note at issue in this dispute, recognizing that that Note is invalid, procured through unlawful duress and for zero consideration.

4. Apparently under new control upon the passing of Mr. Driehaus, his successors in interest have now emerged near the end of the statute of limitations to attempt to enforce this long-neglected, unenforceable "Note."

5. Not only is the Note invalid and unenforceable, but Plaintiffs are liable for their bad faith and coercive conduct that cost Mr. Abrams millions of dollars in consideration for the sale of the company he worked for years to build.

\*       \*       \*

6.     Mr. Abrams is the former manager of CV Holdings, LLC ("CV Holdings").

7.     Until January 31, 2015, CV Holdings was the parent company of CSP Technologies, Inc. ("CSP"), a pharmaceutical packaging manufacturer that held more than 330 global patents and specialized in producing diabetes test strip packaging vials.

8.     CSP's major customers were the diabetic testing divisions of the world's leading healthcare companies.

9.     As of January 31, 2015, CSP's patent-protected desiccant plastic vials made CSP a leader in global market share of diabetes test strip packaging.

10.     CV Holdings' membership consisted of Mr. Abrams and five minority investors (the "Minority Investors").

11.     Among the Minority Investors was Richard Driehaus, the founder, chief investment officer, and chairman of Driehaus Capital Management LLC, based in Chicago.  Mr. Driehaus's interests in CV Holdings were held via his Smart Plastics entities, the Plaintiffs in this lawsuit.

12.     A mutual fund industry pioneer, Mr. Driehaus is regarded as one of the most successful American investors of all time.

13.     On information and belief, Plaintiffs are single-use investment entities used by Mr. Driehaus to invest in CV Holdings.

14.     The other Minority Investors in CV Holdings were: (1) Bill Wells, of Memphis, Tennessee, the President of Pope Asset Management, who held his interests through Southern Advanced Materials LLC ("Mr. Wells"); (2) an entity affiliated with MassMutual, a life insurance and financial services company ("MassMutual"); (3) an entity affiliated with the Bank of New York Mellon Corporation, an investment banking services holding company ("BNY Mellon"); and

(4) Matt Sullivan, of Atlanta, Georgia, the Co-Founder of Peachtree Equity Partners ("Mr. Sullivan").

15.    Mr. Abrams had a roughly 64% interest in CV Holdings, and Mr. Driehaus (via Plaintiffs), Mr. Wells, MassMutual, BNY Mellon, and Mr. Sullivan collectively held 36% of CV Holdings.

16.    The Plaintiffs' stake was, collectively, less than 5%.

17.    In the event of a sale of CV Holdings' assets, the Minority Investors were subject to a "Go Along Obligation" (sometimes referred to as a "drag-along" obligation), requiring the Minority Investors including Plaintiffs to sell their interests, on a pro rata basis, on the same terms received by Defendant, and entitling them to no more than their pro rata share of the proceeds from the sale.

18.    In or about 2010, CV Holdings executed an agreement to sell 80% of CSP to a private equity buyer ("PE Buyer").  Based on the allocations of their pro rata share in CSP, Minority Investors expected to receive approximately 7% returns on their investment in CSP in the transaction with PE Buyer.  This structure would have resulted in Mr. Driehaus (via Plaintiffs) reaping an approximately $17 million payout on the transaction.

19.    However, PE Buyer ultimately was unable to obtain the necessary financing for the deal.

20.    Approximately three years later, in or about the Spring of 2013, CSP engaged Morgan Stanley's investment banking services ("Morgan Stanley") to facilitate a sale or partial sale of CSP.

21.   In late 2013 or early 2014, after unsuccessful discussions with other potential buyers, Morgan Stanley connected CV Holdings with potential buyer Wendel Group ("Wendel"), a French investment company, with whom CV Holdings began negotiating.

22.   During the course of negotiations, CSP's business suffered dramatically as the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (codified as amended in scattered sections of 42 U.S.C.) (the "ACA") took effect in January 2014.

23.   Three of CSP's key customers sold off their diabetic testing divisions after taking on losses, and a large swath of the market for CSP's products disappeared.

24.   In the declining market, the price of CSP's signature product dropped from $65 to $15, and Morgan Stanley ceased its efforts to broker a sale of CSP.

25.   Facing the urgent need to sell an embattled CSP while it retained its value, Mr. Abrams as manager of CV Holdings engaged with J.P. Morgan for investment banking services in or about July 2014.

26.   CV Holdings received eight bids for CSP, including a bid from Wendel for a total buyout of CSP for $360 million (the "Wendel Buyout").

27.   Unfortunately, Plaintiffs and CV Holdings' other minority owners undertook unlawful and coercive tactics to extract more value out of the deal than they were entitled to, which substantially delayed the transaction.

28.   The Wendel Buyout did not close until January 31, 2015—months after the parties' intended closing date—and the Plaintiffs' obstruction and delay resulted in a much lower final deal price of between $335 and $340 million, costing Defendant many millions of dollars.

29.   More specifically, CV Holdings and Wendel had negotiated an initial closing date for the Wendel Buyout for in or about August or September 2014.

30.    Within CV Holdings, Mr. Abrams and the Minority Investors negotiated to ensure approximate returns of 7% for each Minority Investor, in line with what the Minority Investors had been slated to realize in the prior attempted partial buyouts.

31.    Specifically, Mr. Driehaus executed a written agreement by which he would receive an approximately $17 million return, roughly equal to the return on investment he was slated to receive in the original proposed transaction with PE Buyer, before the market cratered.

32.    Indeed, in that written agreement, dated November 12, 2014 (the "Payout Agreement"), Mr. Driehaus, on Plaintiffs' behalf, expressly agreed to the "Go Along Obligation" under the parties' governing operating agreement (the "Operating Agreement"), approved the Wendel Buyout, waived Plaintiffs' right to obtain a third-party advisor's fairness opinion regarding the sale price, and accepted Plaintiffs' $17.5 million share of the proceeds of the sale transaction "in consideration for all of [Plaintiffs'] membership interests in the Company, payable at the closing of the Sales Transaction."

33.    In that same Payout Agreement, in the way of further consideration, Mr. Driehaus agreed that he would "reduce the amount of cash proceeds he would otherwise be entitled to receive with respect to the Sale Transaction."

34.    Mr. Sullivan, MassMutual, and BNY Mellon also agreed to similar returns as in earlier proposed transactions with PE Buyer and Mitsubishi Chemical, in accordance with their rights to receive only their pro rata share of the proceeds from the Wendel Buyout.

35.    As negotiations with Wendel continued, however, the Minority Investors breached their agreements and their duties of good faith and fair dealing by making various unlawful demands to extort further value from Mr. Abrams to which they were not entitled.

36.     Mr. Driehaus in particular approached Mr. Abrams and demanded—despite the fully executed Payout Agreement, the absence of any other right, and the lack of any further consideration—an additional $7 million, on top of the $17.5 million agreed to in their Payout Agreement.

37.     By this time, the originally scheduled closing date of September 2014 had passed, and CSP's revenues had continued to suffer.  CSP was on the verge of bankruptcy.

38.     Mr. Abrams found himself between Scylla and Charybdis: on the one hand, he had a duty to ensure that CV Holdings received maximum value for the significantly distressed CSP by ensuring the Wendel Buyout would close; on the other, Plaintiff and the other Minority Investors were acting in breach of their contractual and good faith duties to extort additional value from the Wendel Buyout to which they had no right.

39.     In November 2014, Wendel contacted CV Holdings seeking to cancel the sale, citing the missed closing date.  Mr. Abrams assured Wendel that he could salvage the deal and requested additional time.

40.     With short time to resolve the hold-out and facing cancellation of the Wendel Buyout and a looming bankruptcy, Mr. Abrams approached the Minority Investors in a do-or-die effort to salvage the Wendel Buyout.

41.     Mr. Driehaus still purported to refuse to consent to the Wendel Buyout and demanded that Mr. Abrams personally guarantee him, through Plaintiffs, the additional $5,366,589 in the form of the Note which is the subject of this Litigation—again, despite the fully executed Payout Agreement and the complete absence of any additional consideration.

42.     To avoid CSP's bankruptcy and ensure closing of the Wendel Buyout, Mr. Abrams acquiesced under economic duress to Mr. Driehaus's demands, which included, ultimately, executing the Note.

43.     Plaintiffs' demand for the Note came with zero consideration beyond what had already been agreed in the Payout Agreement.

44.     Mr. Abrams executed the Note on January 29, 2015, two days before the closing of the Wendel Buyout, which reflects a principal amount of $5,366,589.

45.     Mr. Abrams did not receive $5,366,589, or any other consideration, in exchange for executing the Note, nor did Mr. Driehaus convey or extend $5,366,589 (or any other amount) to Mr. Abrams in relation to the Note or otherwise, nor does the Note purport to be based on any consideration other than a loan of $5,366,589 that was never in fact loaned. In other words, the Note is wholly illusory.

46.     Rather, Plaintiffs, received an undue, outsized return on the Wendel Buyout.

47.     The Wendel Buyout closed on or about January 31, 2015.

48.     The assessed enterprise value of CSP was initially agreed by Wendel to be $360 million. Due to delays caused by the Minority Investors, the final closing price for CSP in the Wendel Buyout was between $335 and $340 million.

49.     Attached as Exhibit 1 is a true and accurate copy of the Payout Agreement, dated November 12, 2014, executed by Mr. Driehaus on behalf of Plaintiffs and by Mr. Abrams.

## FIRST AFFIRMATIVE DEFENSE
### (Contract void as a matter of law)

50. Mr. Abrams re-alleges paragraphs 1 to 49 of the Statement of Facts Supporting Affirmative Defenses and Counterclaims and incorporates herein all factual allegations pertaining to his Affirmative Defenses.

51. Plaintiffs' claim for breach of the Note is barred because the Note is void and unenforceable as a matter of law.

52. Under the Illinois Promissory Note and Bank Holiday Act, 815 ILCS 105/9, "In any action upon a note… if it shall appear that such instrument was made or entered into without a good or valuable consideration, or that the consideration has wholly failed, judgment shall be rendered in favor of the defendant."

53. Plaintiffs in the Payout Agreement agreed to unambiguous terms approving the sale transaction, and governing their receipt of $17.5 million for full payment for their interests in CSP, and in turn Mr. Abrams, among other things, relinquished amounts to which he otherwise would be entitled in the sale.

54. Plaintiffs' subsequent demand of more than $5.3 million and a corresponding Note from Mr. Abrams was supported by zero additional consideration than what was already agreed in the Payout Letter.

55. Plaintiffs did not loan Mr. Abrams the principal funds identified by the Note as consideration in exchange for any obligation to pay the Note.

56. Mr. Driehaus via Plaintiffs, who had no rights other than to receive his pro rata share of the Wendel Buyout, nonetheless abused his stake in CSP and his membership interest in CV Holdings.

57.     Through Mr. Driehaus' abuse of his position, he received an outsized return on the Wendel Buyout, and forced Mr. Abrams to personally issue an illusory and unenforceable Note for which Mr. Abrams was granted zero consideration.

58.     Accordingly, the Note is void and unenforceable in its entirety as a matter of law.

**SECOND AFFIRMATIVE DEFENSE**
**(Failure of consideration)**

59.     Mr. Abrams re-alleges paragraphs 1 to 49 of the Statement of Facts Supporting Affirmative Defenses and Counterclaims and incorporates herein all factual allegations pertaining to his Affirmative Defenses.

60.     Plaintiffs' claim for breach of the Note is barred for failure of consideration.

61.     Plaintiffs in the Payout Agreement agreed to unambiguous terms approving the sale transaction, and governing their receipt of $17.5 million for full payment for their interests in CSP, and in turn Mr. Abrams, among other things, relinquished amounts to which he otherwise would be entitled in the sale.

62.     Plaintiffs' subsequent demand of more than $5.3 million and a corresponding Note from Mr. Abrams was supported by zero additional consideration than what was already agreed in the Payout Letter.

63.     Plaintiffs neglected, refused, and/or failed to tender funds to Mr. Abrams as Borrower on the Note, and instead extracted Mr. Abrams' signature on the Note in order to capitalize on CV Holdings' position in the Wendel Buyout to their personal gain.

64.     Plaintiffs failed to furnish the agreed-on consideration, as identified by the Note, "a loan in the principal amount of Five Million Three Hundred Sixty Six Thousand Five Hundred Eighty Nine and no/100 Dollars ($5,366,589.00)."

65.     Mr. Driehaus via Plaintiffs, who had no rights other than to receive his pro rata share of the Wendel Buyout, nonetheless abused his stake in CSP and his membership interest in CV Holdings.

66.     Through Mr. Driehaus' abuse of his position, he received an outsized return on the Wendel Buyout, and forced Mr. Abrams to personally issue an illusory and unenforceable Note for which Mr. Abrams was granted zero consideration.

67.     Accordingly, the Note's consideration fails, as does Plaintiffs' claim for breach of the Note.

## FOURTH AFFIRMATIVE DEFENSE
### (Lack of consideration)

68.     Mr. Abrams re-alleges paragraphs 1 to 49 of the Statement of Facts Supporting Affirmative Defenses and Counterclaims and incorporates herein all factual allegations pertaining to his Affirmative Defenses.

69.     Plaintiffs' claim for breach of the Note is barred for lack of consideration.

70.     The Note was never enforceable for lack of consideration.

71.     Plaintiffs in the Payout Agreement agreed to unambiguous terms approving the sale transaction, and governing their receipt of $17.5 million for full payment for their interests in CSP, and in turn Mr. Abrams, among other things, relinquished amounts to which he otherwise would be entitled in the sale.

72.     Plaintiffs' subsequent demand of more than $5.3 million and a corresponding Note from Mr. Abrams was supported by zero additional consideration than what was already agreed in the Payout Letter.

73.     Through Mr. Driehaus' abuse of his position, he received an outsized return on the Wendel Buyout, and forced Mr. Abrams to personally issue an illusory and unenforceable Note for which Mr. Abrams was granted zero consideration.

74.     Accordingly, the Note lacks consideration, and was not a valid contract, and Plaintiffs' claim for breach of the Note fails.

### FIFTH AFFIRMATIVE DEFENSE
### (Unconscionability)

75.     Mr. Abrams re-alleges paragraphs 1 to 49 of the Statement of Facts Supporting Affirmative Defenses and Counterclaims and incorporates herein all factual allegations pertaining to his Affirmative Defenses.

76.     Plaintiffs' claim for breach of the Note is barred by reason of unconscionability.

77.     The Note is substantively and procedurally unconscionable because its terms are altogether one-sided.

78.     Plaintiffs in the Payout Agreement agreed to unambiguous terms approving the sale transaction, and governing their receipt of $17.5 million for full payment for their interests in CSP, and in turn Mr. Abrams, among other things, relinquished amounts to which he otherwise would be entitled in the sale.

79.     Plaintiffs' subsequent demand of more than $5.3 million and a corresponding Note from Mr. Abrams was supported by zero additional consideration than what was already agreed in the Payout Letter.

80.     Through Mr. Driehaus' abuse of his position, he received an outsized return on the Wendel Buyout, and forced Mr. Abrams to personally issue an illusory and unenforceable Note for which Mr. Abrams was granted zero consideration.

81.     Mr. Driehaus via Plaintiffs thereby attempted to obtain a windfall by exploiting Mr. Abrams and CV Holdings' dire position with CSP, which was in a declining market and facing bankruptcy.

82.     Plaintiffs never loaned any funds to Mr. Abrams in exchange for his execution of the Note.

83.     Enforcing the Note against Mr. Abrams would shock the conscience, as he never borrowed any of the funds identified by the Note, and upon which Plaintiffs demand millions of dollars in interest.

84.     Accordingly, the Note is unenforceable for reasons of unconscionability.

## SIXTH AFFIRMATIVE DEFENSE
### (Usury)

85.     Mr. Abrams re-alleges paragraphs 1 to 49 of the Statement of Facts Supporting Affirmative Defenses and Counterclaims and incorporates herein all factual allegations pertaining to his Affirmative Defenses.

86.     Plaintiffs' claims are barred because, taking Plaintiffs' allegations as true, the Note Plaintiffs seek to enforce is usurious.

87.     The annual interest rate under the Note is seven percent (7%) per annum.

88.     Plaintiffs allege they are entitled to interest under the Note's default interest rate of twelve percent (12%) per annum.

89.     Plaintiffs never loaned any funds to Mr. Abrams in exchange for his execution of the Note.

90.     Mr. Abrams never received from Plaintiffs the principal amount of the Note.

91.     Mr. Abrams did not use the principal amount of the Note for any business purpose, because he never received the principal amount.

92.     Through Mr. Driehaus' abuse of his position, he received an outsized return on the Wendel Buyout, and forced Mr. Abrams to personally issue an illusory and unenforceable Note for which Mr. Abrams was granted zero consideration.

93.     Plaintiffs seek millions of dollars in interest under the Note on a principal amount never loaned to Mr. Abrams.

94.     Plaintiffs are barred from recovering any interest on an obligation that bears usurious interest under the Illinois Interest Act, 815 ILCS 205/1 *et seq*.

95.     Accordingly, the Note is unenforceable because it is usurious.

**SEVENTH AFFIRMATIVE DEFENSE**
**(Equitable Defenses)**

96.     Mr. Abrams re-alleges paragraphs 1 to 49 of the Statement of Facts Supporting Affirmative Defenses and Counterclaims and incorporates herein all factual allegations pertaining to his Affirmative Defenses.

97.     Plaintiffs' claim for breach of the Note is barred by doctrines of estoppel, waiver, laches, and/or other equitable doctrines, including without limitation, unclean hands.

98.     Plaintiffs engaged in bad faith and misconduct in securing the Note in the first instance.

99.     Plaintiffs by subsequent dealing evinced no intention of asserting their purported rights under the Note.

100.    Through Mr. Driehaus' abuse of his position, he received an outsized return on the Wendel Buyout, and forced Mr. Abrams to personally issue an illusory and unenforceable Note for which Mr. Abrams was granted zero consideration.

101.    Plaintiffs acted in bad faith by abusing their position in CV Holdings during the Wendel Buyout in attempts to obtain Mr. Abrams' agreement to the Note to secure a windfall payment under the Note.

102.    Plaintiffs were obligated to consummate the Wendel Buyout notwithstanding the execution of the Note.

103.    Plaintiffs engaged in misconduct by substantially delaying the closing of the Wendel Buyout to CV Holdings' detriment to enrich themselves at the expense of Mr. Abrams.

104.    Plaintiffs received the full bargained-for consideration in accordance with their payout agreement in the Wendel buyout.

105.    The Note's Maturity Date was October 1, 2015.

106.    Plaintiffs have had full knowledge of the Note and the circumstances giving rise to their claims in this suit for almost eight years, and delayed asserting their alleged rights under the Note.

107.    When Plaintiffs' previous counsel contacted Mr. Abrams regarding the Note in or about June 2019, after the Undersigned explained the factual circumstances of the Note's execution in the context of the Wendel buyout and Mr. Abrams' consistent position that it was unenforceable, Plaintiffs' previous counsel refrained from pursuing the matter further.

108.    Plaintiffs freely and intentionally gave up any purported right to require Mr. Abrams' performance under the Note.

109.    Plaintiffs unjustifiably delayed formally asserting their purported rights under the Note for almost eight years, filing this suit long after the Note's Maturity Date.

110.     Mr. Abrams did not know that Plaintiffs intended to bring this suit to assert their purported rights under the Note, and the most recent contact with Plaintiffs did not put Mr. Abrams on notice that this matter was unsettled.

111.     This delay induced Mr. Abrams to adversely change his position and order his affairs without regard for any of the alleged liabilities under the Note.

112.     Accordingly, Plaintiffs claims on the Note fail by operation of various equitable defenses, including without limitation equitable doctrines of estoppel, waiver, laches, unclean hands, and/or other equitable doctrines.

**EIGHTH AFFIRMATIVE DEFENSE**
**(Economic Duress)**

113.     Mr. Abrams re-alleges paragraphs 1 to 49 of the Statement of Facts Supporting Affirmative Defenses and Counterclaims and incorporates herein all factual allegations pertaining to his Affirmative Defenses.

114.     Plaintiffs' claim for breach of the Note is barred by reason of economic duress.

115.     With the execution of the Note during the Wendel Buyout, Plaintiffs induced Mr. Abrams, by wrongful acts and by threatening to breach their duties to CV Holdings, to make a contract under circumstances that deprived Mr. Abrams of the exercise of his own free will.

116.     Plaintiffs had no legal right to demand a higher payout from CV Holdings in the context of the Wendel Buyout when they demanded that Mr. Abrams issue them the Note over threats they would sabotage the Wendel Buyout.

117.     Through Mr. Driehaus' abuse of his position, he received an outsized return on the Wendel Buyout, and forced Mr. Abrams to personally issue an illusory and unenforceable Note for which Mr. Abrams was granted zero consideration.

118.    Faced with a declining market for CSP's products, Wendel's threat of terminating the Wendel Buyout, and Plaintiffs' and the other Minority Investors' demands for additional payment, Mr. Abrams signed the Note under considerable economic duress.

119.    Mr. Abrams thereby acted under duress, in accordance with his duties as a member of CV Holdings to ensure it obtained the highest possible purchase price for its asset, CSP.

120.    Accordingly, Plaintiffs' claims on the Note are barred as they obtained it while Mr. Abrams was experiencing economic duress caused by the Plaintiffs and the other Minority Investors.

## NINTH AFFIRMATIVE DEFENSE
### (Release of Claims on the Note – In the Alternative)

121.    Mr. Abrams re-alleges paragraphs 1 to 49 of the Statement of Facts Supporting Affirmative Defenses and Counterclaims and incorporates herein all factual allegations pertaining to his Affirmative Defenses.

122.    In the alternative, Plaintiffs expressly agreed to release Mr. Abrams of all claims related to the Wendel Buyout and their membership units upon closing of the Wendel Buyout.

123.    Accordingly, this suit on the Note, which Mr. Driehaus obtained in connection with the Wendel Buyout, is barred by operation of the release executed by Plaintiffs.

## FIRST COUNTERCLAIM
### (Breach of Payout Agreement)

124.    Mr. Abrams re-alleges paragraphs 1 to 49 of the Statement of Facts Supporting Affirmative Defenses and Counterclaims.

125.    The Wendel Buyout was scheduled to close in September 2014 for a $360 million purchase price of CSP.

126.    The Wendel Buyout ultimately closed on or about January 31, 2015, for a purchase price between $335 million and $340 million.

127.    In the Payout Agreement, Mr. Driehaus, on Plaintiffs' behalf, expressly agreed on or around November 14, 2014 to the "Go Along Obligation" under the Operating Agreement, approved the Wendel Buyout, waived Plaintiffs' right to obtain a third-party advisor's fairness opinion regarding the sale price, and accepted Plaintiffs' $17.5 million share of the proceeds of the sale transaction "in consideration for all of [Plaintiffs'] membership interests in the Company, payable at the closing of the Sales Transaction."

128.    In that same Payout Agreement, in the way of further consideration, Mr. Driehaus agreed that he would "reduce the amount of cash proceeds he would otherwise be entitled to receive with respect to the Sale Transaction."

129.    Mr. Driehaus, on Plaintiffs' behalf, held out on the Wendel Buyout, causing it to close on January 31, 2015, after the execution of the unenforceable Note on January 29, 2015.

130.    As a result of Mr. Driehaus' demand of an excessive return and hold-out to extract the Note, to which he had no right and offered no consideration, Mr. Driehaus caused extensive unjustified delay in the closing of the Wendel Buyout.

131.    Mr. Driehaus, via Plaintiffs, thereby breached his duties to CV Holdings under his Payout Agreement.

132.    Mr. Driehaus's breach caused a $20 million to $25 million loss owing to the delay in closing the Wendel Buyout.

133.    Mr. Abrams, by contrast, has complied with the Payout Agreement in all respects.

134.    Mr. Abrams, as manager of CV Holdings, received a lower payout on the Wendel Buyout caused by loss owing to the delay caused by Mr. Driehaus's breach.

135.    Accordingly, Mr. Abrams is entitled to compensatory damages from Plaintiffs.

## SECOND COUNTERCLAIM
### (Breach of CV Holdings Operating Agreement)

136.    Mr. Abrams re-alleges paragraphs 1 to 49 of the Statement of Facts Supporting Affirmative Defenses and Counterclaims.

137.    The Wendel Buyout was scheduled to close in September 2014 for a $360 million purchase price of CSP.

138.    The Wendel Buyout ultimately closed on or about January 31, 2015, for a purchase price between $335 million and $340 million.

139.    In the Operating Agreement, Mr. Driehaus, on Plaintiffs' behalf, expressly agreed to a "Go Along Obligation."

140.    Under the "Go Along Obligation" provision, in the event of a sale of CV Holdings' assets, the Minority Investors including Plaintiffs were required to sell their interests, on a pro rata basis, on the same terms received by Defendant, and entitling them to no more than their pro rata share of the proceeds from the sale.

141.    In breach of that obligation, Mr. Driehaus on behalf of Plaintiffs unjustifiably held out on the Wendel Buyout and demanded additional funds and the Note.

142.    Mr. Driehaus's demands and holdout on the Wendel Buyout constituted a material breach of the Operating Agreement.

23

143.     Mr. Driehaus's breach caused a $20 million to $25 million loss owing to the delay in closing the Wendel Buyout.

144.     Mr. Abrams, by contrast, has complied with the Operating Agreement in all respects.

145.     Mr. Abrams, as manager of CV Holdings, received a lower payout on the Wendel Buyout caused by loss owing to the delay caused by Mr. Driehaus's breach.

146.     Accordingly, Mr. Abrams is entitled to compensatory damages from Plaintiffs.

### THIRD COUNTERCLAIM
### (Promissory Fraud)

147.     Mr. Abrams re-alleges paragraphs 1 to 49 of the Statement of Facts Supporting Affirmative Defenses and Counterclaims.

148.     In the Payout Agreement, Mr. Driehaus, on Plaintiffs' behalf, expressly agreed on or around November 14, 2014 to the "Go Along Obligation" under the Operating Agreement, approved the Wendel Buyout, waived Plaintiffs' right to obtain a third-party advisor's fairness opinion regarding the sale price, and accepted Plaintiffs' $17.5 million share of the proceeds of the sale transaction "in consideration for all of [Plaintiffs'] membership interests in the Company, payable at the closing of the Sales Transaction."

149.     Plaintiffs' subsequent conduct, via Mr. Driehaus, established that Plaintiffs had no intention of complying with their valid and binding agreements in the Payout Agreement.

150.     Mr. Driehaus subsequently claimed entitlement to a higher share of the proceeds from the Wendel Buyout notwithstanding his obligations under the Payout Agreement.

151.     Mr. Driehaus knew that CSP was distressed and that its value was in decline.

152.     Mr. Driehaus knew that CV Holdings needed to close the Wendel Buyout quickly to ensure the greatest returns for its members' investments in CSP.

153. Mr. Driehaus's concealment of his intent not to comply with the Payout Agreement's obligations at the time he entered into that agreement, caused Mr. Abrams to move forward with the Wendel Buyout in good faith.

154. Mr. Driehaus's subsequent about-face of violating the Buyout Agreement and claiming an entitlement to a higher payoff caused delayed closing of the Wendel Buyout and caused CV Holdings to receive a lower price for CSP in the Wendel Buyout.

155. Mr. Driehaus's knowing false statements caused damages to Mr. Abrams, who received a lower payout on the Wendel Buyout caused by loss owing to the delay caused by Mr. Driehaus's promissory fraud.

156. Mr. Driehaus's knowing false statements caused damages to Mr. Abrams, who has incurred costs in litigating the Note, which includes attorneys' fees and costs of suit.

## FOURTH COUNTERCLAIM
### (Unjust Enrichment – In the Alternative)

157. Mr. Abrams re-alleges paragraphs 1 to 49 of the Statement of Facts Supporting Affirmative Defenses and Counterclaims.

158. In the alternative, in the even the Court finds that the Payout Agreement is unenforceable or otherwise inapplicable to the claims in this matter, Mr. Abrams is entitled to restitution for the payout of proceeds from the Wendel Buyout received by Mr. Driehaus on Plaintiffs' behalf above their pro rata interest in CSP.

159. Plaintiffs accepted and retained funds from Mr. Abrams to which they were not entitled under the Operating Agreement.

160. Plaintiffs demanded those funds notwithstanding their obligation under the Operating Agreement to go along with the Wendel Buyout.

161.    Mr. Driehaus in particular approached Mr. Abrams and demanded—despite the fully executed Payout Agreement, the absence of any other right, and the lack of any further consideration—an additional $5 million plus, on top of the $17.5 million agreed to in their Payout Agreement—all of which exceeded Plaintiffs' pro rata share of the sale proceeds.

162.    It is unjust to permit Plaintiffs to retain the benefit of these funds, or their purported right to repayment under the Note, without compensating Mr. Abrams for it.

163.    Permitting Plaintiffs to retain these funds violates the fundamental principles of justice, equity, and good conscience.

164.    Plaintiffs will be unjustly enriched at Mr. Abrams' expense if permitted to retain these funds, and therefore Mr. Abrams is entitled to full restitution of the value of the benefit.

**FIFTH COUNTERCLAIM**
**(Implied Covenant of Good Faith and Fair Dealing)**

165.    Mr. Abrams re-alleges paragraphs 1 to 49 of the Statement of Facts Supporting Affirmative Defenses and Counterclaims.

166.    Plaintiffs, in violating the Go Along Obligation of the Operating Agreement, acted in bad faith to abuse their position—and to exploit, CSP, CV Holdings, and Mr. Abrams' distressed positions—in the Wendel Buyout.

167.    Demanding additional consideration in exchange for acquiescing to the Wendel Buyout, including demanding the Note, was an unreasonable, arbitrary, and capricious exercise of contractual discretion by Plaintiffs.

168.    Demanding the Note was a breach of the Implied Covenant of Good Faith and Fair Dealing, in addition to a breach of the Payout Agreement and Go Along Obligation of the Operating Agreement.

169.    Plaintiffs' breach of the Implied Covenant of Good Faith and Fair Dealing caused damages to Mr. Abrams, who received a lower payout on the Wendel Buyout caused by loss owing to the delay caused by Mr. Driehaus's promissory fraud.

170.    Mr. Driehaus's knowing false statements caused damages to Mr. Abrams, who has incurred costs in litigating the Note, which includes attorneys' fees and costs of suit.

## JURY TRIAL DEMAND

Mr. Abrams demands a jury trial on all issues so triable.

WHEREFORE, Defendant respectfully request that this Court enter judgment in Defendant's favor and against Plaintiff, and award Defendant damages on its counterclaims, plus Defendant's reasonable attorneys' fees and costs of suit, and such other relief as the Court deems just and proper.


Date: March 6, 2023                              Respectfully submitted,


                                    By:  /s/ Jeffrey J. Bushofsky
                                         Jeffrey J. Bushofsky
                                         jeffrey.bushofsky@ropesgray.com
                                         Timothy R. Farrell
                                         timothy.farrell@ropesgray.com
                                         Francis X. Liesman
                                         francis.liesman@ropesgray.com
                                         ROPES & GRAY LLP
                                         191 N. Wacker Drive
                                         Chicago, Illinois 60606
                                         Telephone: (312) 845-1200
                                         Facsimile: (312) 845-5559

                                         *Counsel for Robert S. Abrams*

## CERTIFICATE OF SERVICE

I certify that on March 6, 2023, the undersigned as counsel for Defendant Robert S. Abrams caused a copy of the foregoing Answer, Affirmative Defenses, and Counterclaims to be served on counsel of record listed below, via electronic mail:

Michael T. Trucco
John J. Kakacek
Stamos & Trucco LLP
One E. Wacker Drive – Third Floor
Chicago, Illinois 60601
Telephone: (312) 630-7979
Facsimile: (312) 630-1183
mtrucco@stamostrucco.com
jkakacek@stamostrucco.com

*Counsel for Plaintiffs*

By: /s/ Jeffrey J. Bushofsky
Jeffrey J. Bushofsky
jeffrey.bushofsky@ropesgray.com
ROPES & GRAY LLP
191 N. Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5559

*Counsel for Robert S. Abrams*